## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | | |
|---|---|---|
| **ELAINE L. CHAO, Secretary of Labor,** | : | |
| **U.S. Department of Labor,** | : | |
| | : | |
| **Plaintiff,** | : | |
| **vs.** | : | **5:06-CV-341 (CAR)** |
| | : | |
| **BLUE BIRD CORPORATION,** | : | |
| | : | |
| **Defendant.** | : | |

### *BENCH TRIAL ORDER*

The Secretary of Labor filed this action on behalf Ricky Dye, a former employee of

Defendant Blue Bird Corporation ("Blue Bird"), contending that Mr. Dye was unlawfully

discharged in retaliation for raising safety concerns about a work assignment in violation of

section 11(c)(1) of the Occupational Safety and Health Act, 29 U.S.C. § 660(c)(1) ("OSHA").

The Court heard this case without a jury on November 25, 2008, and after considering the

evidence and the applicable law, the Court makes the following Findings of Fact and

Conclusions of Law.  As explained herein, the Court grants judgment in favor of **PLAINTIFF**

and against **DEFENDANT** on all claims.

### FINDINGS OF FACT

Based on the testimony heard at trial and other evidence submitted, the Court makes the

following findings of fact:

Blue Bird hired Ricky Dye in 1979, and at all times relevant to this action, Mr. Dye

worked in Blue Bird's Tool and Die Department.  The events giving rise to this action occurred

on November 18, 2004.  At that time, Donald Martin was the group leader of the Tool and Die

Department, and Steve Hamlan was the Facilities Manager.  Although Don Martin was the
Group Leader of the Tool and Die Department, he was not Mr. Dye's supervisor; Steve Hamlan
was both Mr. Dye's and Don Martin's direct supervisor.  On November 18, 2004, Steve Hamlan
instructed Don Martin to have two employees from the Tool and Die Department hang
approximately six large Christmas wreaths on the front exterior of the Blue Bird building.  In the
past, this job had been performed by the Maintenance Department, and this occasion was the
first time the Tool and Die Department had been requested to perform the job.  At approximately
1 p.m., Don Martin asked Mr. Dye and another employee, Steve Mygrant, to hang the Christmas
wreaths.  Don Martin explained that he asked Mr. Dye to perform this particular job because he
"felt like Dye would do anything.  He could hang the moon if need be."  (Testimony of Don
Martin.)  In order to hang the wreaths, it was determined that Mr. Dye and Mr. Mygrant would
have to operate a JLG lift or "bucket lift."

 After seeing how large the wreaths were–measuring approximately 15 feet in diameter
and weighing between fifty and one hundred pounds each–Mr. Dye expressed concerns to Don
Martin regarding the proper procedure in hanging the wreaths. Steve Mygrant was present when
Mr. Dye expressed his concerns. Specifically, Mr. Dye told Don Martin that neither he nor Mr.
Mygrant knew how to operate a JLG lift, that neither he nor Mr. Mygrant had ever hung the
wreaths before, and that hanging the wreaths would be dangerous.  (Testimony of Ricky Dye and
Steve Mygrant.)  Mr. Dye also expressed concerns that, in hanging the wreaths on the front of
the building, they would be out in the parking lot, twenty-five feet up in the air, with no
knowledge of how to operate the lift.  Mr. Dye also asked for instructions on how to operate the
bucket lift.  Mr. Dye did not refuse to perform the job, he just expressed his safety concerns and

2

wanted proper instructions on how to properly hang the wreaths.

After expressing these safety concerns, Don Martin instructed Mr. Dye to contact their supervisor, Steve Hamlan.  Thus, at approximately 1:30 p.m., Mr. Dye called Steve Hamlan on the telephone.  Mr. Dye told Hamlan that they "could get killed trying to do this;" that they "[did not] know what they [were] doing;" that they "[did not] know how to operate the lift;"and that they "could get hurt."  Thereafter, Hamlan told Mr. Dye to "not worry about it," that he would get someone else to do the job.  Again, Mr. Dye told Hamlan that he was not refusing to perform the job, he just wanted proper instructions on how to operate the lift and properly hang the wreaths.

Having been told that Steve Hamlan would get someone else to hang the wreaths, Mr. Dye went back to working in other capacities.  At approximately 2:30 p.m., Mr. Dye was told by another employee that Steve Hamlan had given Mr. Dye a "strike."  Although Mr. Dye had never heard the term before, he believed it to be some sort of disciplinary action taken against him for not hanging the wreaths.  Thus, Mr. Dye went to Don Martin and asked him to set up a meeting with Steve Hamlan to determine what the term "strike" meant and whether he had, in fact, received such a "strike" because he had not hung the Christmas wreaths.  Mr. Dye was concerned about his employment record and was also concerned about his job because Mr. Hamlan had a reputation for firing people.

Approximately thirty minutes later, around 3:00 p.m., a meeting took place in Hamlan's office wherein Mr. Dye, his group leader Don Martin, and his supervisor Steve Hamlan were present.  At the meeting, Hamlan asked Mr. Dye why he had refused to hang the wreaths.  Mr. Dye responded that he did not refuse to perform the work, he just felt that he could have gotten

hurt, and it was not safe to perform the tasks without proper instructions on how to operate the bucket lift.  After further exchange and disagreement on whether Don Martin had given Mr. Dye instructions on how to operate the bucket lift, Steve Hamlan told Mr. Dye to lay his work badge on the table, lock his tool box, and get out, thereby terminating him from employment.  Mr. Dye laid his badge on the table, and Don Martin escorted him out of Mr. Hamlan's office.  As Mr. Dye and Don Martin were leaving Mr. Hamlan's office, Mr. Dye told Martin to "get away from [him]," that Martin had just "gotten [him] fired." (Testimony of Don Martin.)  Don Martin stated that he believed that Mr. Dye had quit, that he had not been fired.  Thereafter, another Blue Bird employee escorted Mr. Dye out of the building and to his vehicle.  Mr. Dye did not clock out when he left the building.

The next day, Mr. Dye called Mike McCurdy, vice president of Blue Bird's human resources department, and told McCurdy that he had been fired because he had not hung the Christmas wreaths.  Mr. Dye requested that McCurdy investigate the reasons why he had been fired and specifically asked him to also interview his co-worker, Steve Mygrant.  McCurdy informed Mr. Dye that he could not be officially terminated unless he, McCurdy, was involved. He told Mr. Dye that he would investigate the situation.  During his investigation, McCurdy spoke with Steve Hamlan and Don Martin, both of whom told McCurdy that Mr. Dye had turned in his badge and quit.  McCurdy also spoke with Joe Belcastro, Hamlan's supervisor.  McCurdy did not interview Steve Mygrant.  After speaking with these individuals, McCurdy determined that Mr. Dye would no longer be employed with Blue Bird.  McCurdy called Mr. Dye the following Tuesday and told Mr. Dye that he was officially terminated from Blue Bird.

McCurdy testified that he believed that Mr. Dye had voluntarily quit his employment with

4

Blue Bird.  In completing the official paperwork after Mr. Dye's official termination, McCurdy, however, wrote "insubordination" as the reason for Mr. Dye's separation from Blue Bird. McCurdy explained that he wrote "insubordination" on the paperwork because Mr. Dye had "walked off the job and did not punch out."  (Testimony of Mike McCurdy.)  McCurdy also testified that it was proper for Mr. Dye to report safety concerns to his group leader, Don Martin, and that it was not required that Mr. Dye report any safety concerns in writing.  (Testimony of Mike McCurdy.)

After Mr. Dye's termination, on December 2, 2004, Steve Mygrant wrote and signed a statement that he was given the task to hang the wreaths and that he "was able" to perform the task and "had clear instructions without any problem." (Trial Ex. J-15.)  However, Mr. Mygrant testified that the statement was untrue, written at the instruction of Steve Hamlan because he was afraid of losing his job.  Steve Hamlan had a reputation of firing people, and Mr. Mygrant did not want to lose his employment.

During the 15 to 16 years Mr. Dye worked in the Tool and Die Department, he had never received any verbal or written reprimands.  By all accounts, Mr. Dye was a very good employee. In fact, the month before this incident occurred, Mr. Dye had been given his 25th year of service accommodation.

## CONCLUSIONS OF LAW

### Liability under OSHA

The Secretary filed this action alleging that Blue Bird violated Section 11(c)(1) of OSHA by terminating Mr. Dye's employment due to his refusal to work under allegedly unsafe conditions.  Section 11(c)(1) provides:

> No person shall discharge or in any manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this Act or has testified or is about to testify in any such proceeding or because of the exercise by such employee on behalf of himself or others of any right afforded by this chapter.

29 U.S.C. § 660(c)(1); 29 C.F.R. § 1977.3.  Claims alleging wrongful discharge in retaliation for exercising rights afforded under the Act are analyzed under the burden-shifting framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  First, the plaintiff must present sufficient evidence to satisfy the elements of her prima facie case.  Id. at 802.  If a prima facie case is established, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment action.  Id.  If articulated, the plaintiff must show that the defendant's reason was pretextual in order to prevail.  Id. at 802-03.

Prima Facie Case

To establish her prima facie case, the Secretary must show by a preponderance of the evidence that (1) Mr. Dye engaged in protected activity; (2) Blue Bird took adverse action against Mr. Dye; and (3) a causal connection exists between the protected activity and the adverse action. Cotton v. Cracker Barrel Old Country Store, Inc., 434 F.3d 1227, 1233 (11th Cir. 2006).  The Court finds that the Secretary has established a prima facie case of unlawful retaliatory discharge.

First, Mr. Dye engaged in protected activity when he, in good faith, complained about safety concerns first, to his group leader, Don Martin, and second, to his direct supervisor and the Facilities Manager, Steve Hamlan.  Under the Act, an employer may not discharge "any employee because such employee has filed any complaint . . . under or related to this Act[.]"  29 U.S.C. § 660(c)(1); 29 C.F.R. § 1977.3.  "The range of complaints 'related to' the Act is

6

commensurate with the broad remedial purposes of this legislation and the sweeping scope of its application, which entails the full extent of the commerce power." 29 C.F.R. § 1977.9(a). "Further, the salutary principles of the Act would be seriously undermined if employees were discouraged from lodging complaints about occupational safety and health matters with their employers. Such complaints to employers, if made in good faith, therefore would be related to the Act, and an employee would be protected against discharge or discrimination caused by a complaint to the employer." 29 C.F.R. § 1977.9(b). It is undisputed that it was proper for Mr. Dye to make safety complaints to his supervisor.

Moreover, the Act protects Mr. Dye's refusal to hang the Christmas wreaths because he in good faith refused to perform the job in lieu of subjecting himself to serious injury. Although, "as a general matter, there is no right afforded by the Act which would entitle employees to walk off the job because of potential unsafe conditions at the workplace," 29 C.F.R. § 1977.12(b)(1), an employee is protected from discrimination upon a good faith refusal to expose himself to conditions the employee reasonably believes would expose him to death or serious injury. See 29 C.F.R. § 1977.12(b)(2).

Based on the Court's finding that Mr. Dye was terminated from employment, it is clear that the adverse action prong of the prima facie case is met. Thus, the final inquiry the Court must make in determining whether Mr. Dye establishes a prima facie case is whether there is a causal connection between the protected activity and the adverse action. The Court finds that there is. To establish a causal connection, a plaintiff must show that (a) the decision-makers were aware of the protected conduct; and (b) the protected activity and the adverse employment action were not wholly unrelated. Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 590 (11th Cir.

2000).  "The causal link element is construed broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001).

Here, Blue Bird was aware of Mr. Dye's protected activity as evidenced by the fact Mr. Dye repeatedly expressed his safety concerns to both his group leader and his direct supervisor. Additionally, the very close temporal proximity between the safety complaints and his termination – mere hours – is certainly sufficient to meet the causal connection prong.  Very close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to raise an inference of causation. See Clark v. Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001); Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004). Thus, Plaintiff has established his prima facie case.

Legitimate Non-Discriminatory Reason for Termination and Pretext

The Court further finds that Blue Bird's proffered reasons for discharging Mr. Dye are merely pretext for discrimination.  Although Blue Bird maintains that Mr. Dye voluntarily quit, it simultaneously maintains that he was fired for insubordination. Changes in the employer's proffered reason for its employment decision support a finding of pretext.  See Kobrin v. Univ. of Minn., 34 F.3d 698, 703 (8th Cir. 1994); see also E.E.O.C. v. Ethan Allen, Inc., 44 F.3d 116, 120 (2nd Cir. 1995).  Moreover, although Mike McCurdy, the Vice President of Human Resources, stated that he investigated the incident, the Court finds that the investigation was neither thorough nor complete.  McCurdy only interviewed Don Martin, Steve Hamlan, and Joe Belcastro, Hamdan's supervisor, who knew nothing of the incident.  Despite the fact Mr. Dye specifically told McCurdy to interview Steve Mygrant – Mr. Dye's co-worker who was also

asked to hang the wreaths and was present when Mr. Dye first expressed his safety concerns to Don Martin –  McCurdy did not do so.

**Damages**

The parties have filed a Joint Stipulation [Doc. 21] as to damages which this Court adopts and makes a part of this Order.  Plaintiff shall be reinstated at Blue Bird in his prior position with all prior benefits, and shall receive back pay in accordance with the Stipulation.

## CONCLUSION

The Court heard this case without a jury, and after considering the evidence and the applicable law, the Court makes the Findings of Fact and Conclusions of Law as stated herein. For the foregoing reasons, the Court grants judgment in favor of **PLAINTIFF** and against **DEFENDANT** on all claims.

**SO ORDERED**, this 26th day of February, 2009.

S/ C. Ashley Royal
C. ASHLEY ROYAL
UNITED STATES DISTRICT JUDGE

SSH/jlr